**Christopher PYLES, Plaintiff–Appellant,**

v.

**Samuel NWAOBASI, et al., Defendants–Appellees.**

No. 14-3289

United States Court of Appeals, Seventh Circuit.

Argued January 13, 2016

Decided July 21, 2016

Eimeric Reig–Plessis, Geoffrey P. Eaton, Attorneys, Winston & Strawn LLP, Washington, DC, for Plaintiff-Appellant.

Timothy Patrick Dugan, Alexander B. Chosid, Attorneys, Sandberg Phoenix & Von Gontard P.C., St. Louis, MO, for Defendants–Appellees.

Before WOOD, Chief Judge, and BAUER and HAMILTON, Circuit Judges.

WOOD, Chief Judge.

Christopher Pyles, a state prisoner at the Menard Correctional Center, brought a lawsuit alleging that Dr. Samuel Nwaobasi, Dr. Robert Shearing, and their employer, Wexford Health Sources, Inc., provided him constitutionally inadequate medical care. This appeal is about whether he can step up to the plate and take a cut at his case—something he may do only if he properly exhausted his administrative remedies as required by the Prison Litigation Reform Act. Two grievances are at issue. Pyles does not claim to have completed the grievance procedure for either one. Instead, he argues that his lack of compliance should be excused, in the first case because he had good cause for his actions, and in the second because he never received a response to his grievance. After an evidentiary hearing, the magistrate judge found that he had failed properly to exhaust both grievances and recommended summary judgment for the defendants. The district court agreed with that recommendation, but we do not, and so we reverse the district court's judgment in the defendants' favor.

**I**

According to Pyles's complaint, whose allegations we accept for present purposes, his problems can be traced to July 2009, when he fell down a wet staircase and injured his back while incarcerated at Menard. Since that time he has experienced numbness and radiating pain. On September 24, 2012, Pyles was seen by Dr. Samuel Nwaobasi, an employee of Wexford, the private company that furnishes medical care at Menard. Although Pyles complained that his current treatment regimen was ineffective, Dr. Nwaobasi refused to order additional testing or specialist care. Pyles saw Dr. Nwaobasi again on November 2, 2012. During that appointment, Pyles again questioned the effectiveness of Dr. Nwaobasi's approach. Dr. Nwaobasi told Pyles to "shut the hell up" and again refused to order additional testing or specialist care.

The Illinois Administrative Code sets out a three-stage grievance process that Pyles tried to invoke. He began by filing a grievance on November 13, 2012, with respect to both appointments with Dr. Nwaobasi. A grievance counselor received Pyles's grievance on November 30, 2012, and Pyles received the counselor's response on December 3, 2012. Fearing that

the document setting forth his grievance might be lost in the administrative shuffle, Pyles wanted to photocopy his original document before filing it with a grievance officer. According to Pyles's uncontroverted testimony, copies could be made only by the law library, and it did not accept new photocopying orders until December 21, 2012. On that day, Pyles submitted his grievance to the law library for photocopying. By the time he received it back on January 3, 2013, the 60-day window for filing his grievance had passed. Pyles nonetheless submitted the grievance that day. On January 8, 2013, a grievance officer acknowledged receipt of Pyles's grievance against Dr. Nwaobasi. On January 13, 2013, Pyles filed a separate grievance against the library for its delay. Ironically, that grievance was lost in the prison administrative system.

On March 1, 2013, Pyles saw Dr. Robert Shearing, another Wexford employee. He again requested a change in treatment. Dr. Shearing told Pyles that there was "[n]o showing of Neurological Deficit in the x-ray," and that "if medication [didn't] help there [was] nothing [Shearing] could do." Pyles requested an MRI and an examination by a specialist, but Dr. Shearing refused to approve or seek approval for either step, nor did he prescribe any medication that provided effective relief. Pyles filed a grievance against Dr. Shearing on March 27, 2013. On April 11, 2013, the grievance was timely received by the grievance officer. That grievance was denied on June 12, 2013. This time, Pyles says, the problem was that he never received word that the grievance was denied.

On July 30, 2013, Pyles filed this civil rights action in the Southern District of Illinois, alleging that Dr. Nwaobasi, Dr. Shearing, and Wexford violated his right to be free of cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution. As directed by *Pavey v. Con-*

*ley*, 544 F.3d 739 (7th Cir. 2008), the magistrate judge conducted a hearing to determine whether Pyles had exhausted the administrative remedies available to him, as required by the Prison Litigation Reform Act of 1995 (PLRA), 42 U.S.C. § 1997e.

At that hearing, Pyles testified that his grievance against Dr. Nwaobasi was untimely for reasons outside his control, namely, because of the law library's delay in copying and returning it to him. He testified that he actually submitted the grievance the same day it was returned to him: January 3, 2013. The library's delay, he contended, constituted good cause for his failure to file the grievance within the allotted time period, and that it therefore should have been considered under ILL. ADMIN. CODE tit. 20, § 504.810(a). Unpersuaded, the magistrate judge found that he had not shown good cause under § 504.810(a).

Pyles also testified that he did not submit his grievance against Dr. Shearing to the Administrative Review Board because, after submitting it to the grievance officer on March 27, 2013, he never received a response. The defendants offered evidence that the grievance was received by the grievance officer on April 11, 2013, and denied on June 5, 2013; the chief administrative officer confirmed the grievance officer's denial on June 12, 2013.

The defendants, however, submitted no direct evidence that anyone sent the response to Pyles or that he received it. They relied instead on the assumption that Pyles's past practice of asking about the status of the grievances when they were not returned to him, and his failure to do so in this case, meant something. Pyles admitted that he had followed up on previous grievances. But this time, he explained, "[a]fter three months having received no response, I just assumed that

that was it, I wasn't going to receive a response, and filed the lawsuit." Based only on this, the magistrate judge found it "implausible" that Pyles did *not* receive a response to his grievance against Dr. Shearing, and therefore held that Pyles had failed to exhaust his administrative remedies.

## II

We review a dismissal for failure to exhaust *de novo*, construing the facts in the light most favorable to the non-moving party—here, Pyles. *Hernandez v. Dart*, 814 F.3d 836, 840 (7th Cir. 2016) (collecting cases). Because exhaustion is an affirmative defense, it is the defendants' burden to show Pyles's failure to exhaust. See *Maddox v. Love*, 655 F.3d 709, 720 (7th Cir. 2011). Summary judgment is appropriate only when there is no dispute of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).

Under the PLRA, a prisoner must exhaust "such administrative remedies as are available" before bringing a suit "with respect to prison conditions under section 1983 ... or any other federal law." 42 U.S.C. § 1997e(a). The exhaustion requirement is interpreted strictly; thus, a "prisoner must comply with the specific procedures and deadlines established by the prison's policy." *King v. McCarty*, 781 F.3d 889, 893 (7th Cir. 2015). Unexhausted claims are procedurally barred from consideration. See *Woodford v. Ngo*, 548 U.S. 81, 93, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

The PLRA does not, however, demand the impossible. Remedies that are genuinely unavailable or nonexistent need not be exhausted. A remedy becomes unavailable "if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting."

*Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). In such cases, the prisoner is considered to have exhausted his administrative remedies. See *Turley v. Rednour*, 729 F.3d 645, 650 n. 3 (7th Cir. 2013) (collecting cases).

State law determines the administrative remedies that a state prisoner must exhaust for PLRA purposes. *King*, 781 F.3d at 894. As we noted, Illinois has created a three-stage process for its inmates. Step one requires the inmate to attempt to resolve the problem through his or her counselor. See ILL. ADMIN. CODE tit. 20, § 504.810(a). If that does not resolve the problem, the inmate must invoke step two, which involves the filing of a written grievance with a grievance officer. *Id.* This written grievance must be filed within 60 days after discovery of the problem, unless the inmate can "demonstrate that [it] was not timely filed for good cause." *Id.* Properly submitted grievances are considered by the grievance officer and the chief administrative officer. *Id.* § 504.830(d). Where doing so "is reasonably feasible under the circumstances," the chief administrative officer must advise the grievant of the outcome within two months of having received the grievance. *Id.* If unsatisfied with the chief administrative officer's decision, the inmate may, within 30 days after the date of decision, appeal to the director of the Illinois Department of Corrections (step three). *Id.* § 504.850(a). If the director determines that further review is required, the Administrative Review Board evaluates the appeal. *Id.* § 504.850(b).

Pyles admits that he did not properly complete all three stages of the Illinois administrative procedure for either of the two grievances at issue here (the Nwaobasi grievance and the Shearing grievance—his grievance against the library is not part of this suit). Instead he argues that good cause excused his failure to file a

timely grievance against Dr. Nwaobasi, and that the grievance he did file should therefore have been considered under § 504.810(a). As for the grievance against Dr. Shearing, Pyles alleges that he never received a response at the step two stage and thus there was no additional administrative remedy "available" to him. *Dole*, 438 F.3d at 809.

### A

We begin with Pyles's grievance against Dr. Nwaobasi. Illinois, to its credit, does not have a hard-and-fast ban against considering untimely grievances. Instead, it provides that a grievance filed after the expiration of 60 days "shall be considered" if it "was not timely filed for good cause." ILL. ADMIN. CODE tit. 20, § 504.810(a). Pyles submitted his step one grievance to his counselor on November 27, 2012, and she responded on December 3. Pyles's problem arose because he wanted a copy of his grievance for his records, knowing that things sometimes get lost. He had to rely on the law library for his copy, but that was easier said than done. Pyles alleges, without contradiction from the defendants, that the next available day after December 3 on which the law library would collect orders for photocopying was December 21. Pyles submitted his grievance for photocopying on that date, but he did not get the grievance and copy back until January 3, 2013, two days after the 60-day filing period had elapsed. He submitted his grievance that same day. Pyles argues that the library's nearly two-week delay in returning his grievance, coupled with his prompt action thereafter, constitutes good cause for his failure to file the step two grievance on time.

The defendants argue that Pyles's untimeliness should not be excused because "[t]his circuit has taken a strict compliance approach to exhaustion" of the state prison's grievance process. *Dole*, 438 F.3d at 809. But the task here is to interpret what the state process itself requires, and in particular, what "good cause" means under the regulation. Only after we know what the state requires can we apply the rule, strictly or otherwise.

The regulation does not define good cause. Where a regulatory term is undefined, we ask first "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Exelon Generation Co., LLC v. Local 15, Int'l Bhd. of Elec. Workers, AFL–CIO*, 676 F.3d 566, 570 (7th Cir. 2012). In doing so, we "giv[e] the words used their ordinary meaning." *Lawson v. FMR LLC*, — U.S. —, 134 S.Ct. 1158, 1165, 188 L.Ed.2d 158 (2014) (internal citation omitted). Courts frequently look to dictionary definitions, the construction of similar terms in other statutes or regulations, and the purpose of the statute being interpreted. See *United States v. Patel*, 778 F.3d 607, 613 (7th Cir. 2015).

All three of these resources weigh in favor of finding that § 504.810(a)'s "good cause" exception is a flexible, equitable one. First, the dictionary definition of "good cause" is "a cause or reason sufficient in law: one that is based on equity or justice or that would motivate a reasonable [person] under all the circumstances." WEBSTER'S THIRD NEW INT'L DICTIONARY 978 (1986); see also MERRIAM WEBSTER'S DICTIONARY OF LAW 69 (1996) ("a substantial reason put forth in good faith that is not unreasonable, arbitrary, or irrational and that is sufficient to create an excuse under the law," synonymous with "cause that a person of ordinary intelligence would consider a fair and reasonable justification for an act").

Importantly (since this is an Illinois regulation), Illinois law treats good cause as a flexible, fact-based determination in other deadline provisions. See, *e.g.*, *Vision Point of Sale, Inc. v. Haas*, 226 Ill.2d 334, 314

Ill.Dec. 778, 875 N.E.2d 1065, 1078–79 (2007) (noting that "good cause" is "fact-dependent and rests within the sound discretion of the circuit court," and demands that a party provide "clear, objective reasons why it was unable to meet the original deadline and why an extension of time should be granted").

■ Federal law takes the same approach. Interpreting the "good cause" provision of Rule 4 of the Federal Rules of Appellate Procedure, federal courts have found it "in practice ... the same standard as 'due diligence' before the rule" existed. *Del Raine v. Carlson*, 826 F.2d 698, 704 (7th Cir. 1987). It "applies in situations where there is no fault—excusable or otherwise." *Sherman v. Quinn*, 668 F.3d 421, 425 (7th Cir. 2012). Usually, "good cause" is "occasioned by something that is not within the control of the movant." *Bishop v. Corsentino*, 371 F.3d 1203, 1207 (10th Cir. 2004) (quoting Fed. R. App. P. 4(a)(5) cmt. note (2002)); see also *United States v. Hirsch*, 207 F.3d 928, 929–30 (7th Cir. 2000) (suggesting that a clerk's "failure to perform a ministerial act whose omission could have serious adverse consequences for a criminal defendant" would qualify as "good cause" for untimely appeal). Similarly, this court has found that a U.S. Marshal's failure properly to serve a prisoner's notice of appeal "is automatically 'good cause.'" *Sellers v. United States*, 902 F.2d 598, 602 (7th Cir. 1990).

We have interpreted the term this way in the context of PLRA exhaustion. Where an inmate "has no unexhausted administrative remedies" but "the failure to exhaust was innocent (as where prison officials prevent a prisoner from exhausting his remedies)," he must be permitted to exhaust any existing remedies. *Pavey*, 544 F.3d at 742. Although the cases in which we have found good cause have dealt only with the actual filing of grievances, their logic extends to Pyles's situation.

In *Dole v. Chandler*, a prisoner submitted his grievance by the only procedure available to him: leaving it in his "chuck-hole." 438 F.3d at 807. The grievance never made it to the grievance officer. *Id.* We held that where the prisoner "properly followed procedure and prison officials were responsible for the mishandling of his grievance, it cannot be said that [he] failed to exhaust his remedies." *Id.* at 811. The inmate's grievance, we said, "remains unresolved through no apparent fault of his own," and that "[i]n this limited context, prison authorities may not employ their own mistake to shield them from possible liability." *Id.*

We have also recognized "physical incapacitation" as a possible basis for good cause. See *Hurst v. Hantke*, 634 F.3d 409, 412 (7th Cir. 2011). The federal analog to the Illinois regulation defines "a valid reason" excusing delay as "a situation which prevented the inmate from submitting the request within the established time frame." 28 C.F.R. § 542.14(b). It includes as examples "an extended period in-transit during which the inmate was separated from [necessary] documents" and a verified showing that "a response to the inmate's request for copies" of certain documents "was delayed." *Id.*

■ If Pyles's expectation that the library would return his grievance to him within the 60-day window was reasonable, he has demonstrated good cause. According to the record on summary judgment, Pyles submitted his grievance to the law library on the first possible date and filed it on the same day he received it back. The only reason he was two days late was the library's glacial pace in returning his original document (plus copy) to him. The defendants have not shown that this was the library's customary processing time. Nothing shows that Pyles had any reason to expect such a long delay.

The defendants note that there were four days of scheduled holidays between December 21, 2012, and January 3, 2013. They argue that Pyles should therefore have expected the delay, and that thus that the fault for the untimely filing remains with him. We cannot draw that conclusion on summary judgment. Even subtracting those days, the record suggests no reason why Pyles should have expected that it would take nine days to photocopy several pages. The defendants have provided no evidence otherwise. The defendants also note that the inmate in *Dole* made a written (as opposed to photocopied) copy of his grievance, and argue that Pyles should have done likewise. But Pyles "cannot be expected to do more than the state's regulations required of him," *Dole*, 438 F.3d at 809, and we are given no reason to think that the prison would have accepted a handwritten, unauthenticated copy as genuine. Pyles started the grievance process with 35 days remaining before the due date. This was enough time to demonstrate his diligence in pursuing the grievance.

The defendants also rely on *Cannon v. Washington*, 418 F.3d 714 (7th Cir. 2005), but the circumstances there were different. The inmate in *Cannon* failed to follow the Administrative Review Board's instructions for the late grievance procedure. *Id.* at 718. While *Cannon* held that the confiscation of the inmate's legal papers for three weeks did not constitute good cause for late filing, it emphasized that the inmate had not needed them to file a grievance. *Id.* In contrast, Pyles had only one copy of his grievance signed by his counselor. Because it was in the possession of the law library, there was no way for him to submit it before it was returned to him.

■ The defendants also suggest that it was irresponsible of Pyles to have submitted his grievance for photocopying. But as the disappearance of Pyles's separate grievance about the law-library delay dem-

onstrates, grievances and other paperwork are not infrequently lost in the prison administrative system. It was thus reasonable for Pyles to take the precaution of making a copy of his grievance. In fact, encouraging prisoners to do so effectuates one of the purposes of the PLRA's exhaustion requirement: improving the quality of prisoner suits by "the creation of an administrative record that is helpful to the court." *Ngo*, 548 U.S. at 94–95, 126 S.Ct. 2378. The fact that copying a grievance is not a required step in the administrative process says nothing about whether Pyles did everything in his power to comply with that process. There is no reason that Pyles should be faulted for taking entirely reasonable action just because the process did not explicitly require it. The purpose of the exhaustion requirement is to ensure that prisons have "a fair opportunity to correct their own errors" through the grievance process. *Id.* at 94, 126 S.Ct. 2378. Finding good cause in this case would not interfere with that purpose.

Finally, there is little reason to fear the parade of horribles predicted by the defendants. There is little incentive for prisoners to try to evade due dates by last-minute photocopying: they would almost certainly gain nothing by it. (In any event, this was not an instance of "last-minute" action.) Moreover, evidence that the prisoner either was not diligent or had reason to believe he might not receive his photocopies back in time would preclude a finding of exhaustion. Pyles failed to file his grievance in time through no fault of his own. The lateness was caused by circumstances outside Pyles's control—and within the prison's. According to the record, he was diligent throughout the process and followed the Illinois administrative procedures to the greatest extent possible; this adds up to good cause for his two-day delay. The defendants therefore failed to show that he did not exhaust his adminis-

trative remedies with respect to the grievance against Dr. Nwaobasi.

### B

 The Shearing grievance presents a different problem: what happens when a response to a grievance does not reach the prisoner, and so he does not know when to move along to the next step? Pyles testified that he never received a response to his grievance against Shearing, but the magistrate judge (and then the district court) found that Pyles "lack[ed] credibility on this issue." The defendants contend that this determination is binding. We have no quarrel with the normal rule that findings of fact, including credibility determinations, are reviewed for clear error. See *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). But a finding of fact is clearly erroneous if it is "based on errors of fact or logic." *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). Where the evidence underlying a fact, including credibility, supports only speculation about the existence or nonexistence of the contested point, it is clear error to conclude that the point has been established.

 That is the case here. The magistrate judge's finding that Pyles lacked credibility was based on inferences from tangentially relevant evidence: (1) that four of Pyles's previous grievances were returned, and (2) that Pyles had followed up on at least some other grievances, but had not in this case. We must consider whether this, standing alone (as it did), is enough to support the judge's finding that it was "implausible" that Pyles's failure to follow up on the Shearing grievance was because he never received a response.

Those two facts are at best very weak evidence for the proposition at issue. The fact that other grievances were returned to Pyles says nothing about whether *this* grievance was returned to Pyles. (We do not know how many grievances are filed each year at Menard, but it houses almost 3,700 male inmates, see https://www.illinois.gov/idoc/facilities/Pages/menardcorrectionalcenter.aspx.) Because the defendants have provided no evidence that they timely and accurately transmitted a response, they do not enjoy a presumption of receipt. *In re Nimz Transp., Inc.*, 505 F.2d 177, 179 (7th Cir. 1974).

Worse, there is evidence in the prison's own records that undermines the court's finding and supports Pyles. True, the records show that grievance officers responded to some earlier grievances. In fact, Pyles's Cumulative Counseling Summary shows that some were returned to him. But this supports Pyles's account, not the defendants': while the Counseling Summary contains an entry documenting the Shearing grievance, there is no record anywhere indicating that a response to it was given or sent to Pyles. In fact, the Shearing grievance does not appear at all in Pyles's "IGRV Inmate History" of grievances. These holes in the record indicate that Pyles never received a response.

The magistrate judge thought that Pyles's inquiries about other pending grievances (and the lack of any such inquiry about the Shearing grievance) made it implausible to think that he did *not* receive a response to the Shearing grievance. This, in our view, is too much of a stretch, especially in the face of the explanation Pyles gave for why he did not send a status inquiry for the Shearing grievance: "After three months having received no response, I just assumed that that was it, I wasn't going to receive a response, and filed the lawsuit." The magistrate judge pointed to nothing in Pyles's testimony that gave him (or us) reason to doubt this account.

As we have emphasized, it was the defendants' burden to prove that Pyles failed to exhaust his administrative remedies. See *Maddox*, 655 F.3d at 720. The defendants, we conclude, did not meet that burden. They practically admitted this at the *Pavey* hearing, where the defendants' counsel conceded that there was "no proof [about exhaustion of the Shearing grievance] in either direction." But there was competent proof that Pyles never received a response, in the form of his own testimony. The magistrate judge's conclusion to the contrary cannot stand on this record. Pyles exhausted such remedies as were available to him, and so summary judgment for the defendants on the basis of failure to exhaust was inappropriate.

### III

Pyles has shown that, under ILL. ADMIN. CODE tit. 20, § 504.810(a), he had good cause for failing to timely file his grievance against Dr. Nwaobasi. In addition, the defendants did not meet their burden of proving that Pyles failed to exhaust his available administrative remedies for his grievance against Dr. Shearing. The district court's judgment is therefore RE-VERSED as to both grievances, and this case is REMANDED for proceedings consistent with this opinion.