In the

# United States Court of Appeals
## For the Seventh Circuit

No. 16-2106

JOSEPH WILBORN,

*Plaintiff-Appellant,*

*v.*

DAVID EALEY, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 13-cv-70 — **J. Phil Gilbert**, *Judge.*

ARGUED SEPTEMBER 27, 2017 — DECIDED FEBRUARY 7, 2018

Before RIPPLE, SYKES, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Under the Eighth Amendment's protection against "cruel and unusual punishments," convicted prisoners must receive a minimum level of care. The Eighth Amendment prohibits prison staff from subjecting inmates to excessive force without a legitimate penological purpose, from deliberately failing to prevent other staff from using unlawful force, and from acting with deliberate indifference to inmates' serious medical needs. In this case, inmate

Joseph Wilborn was injured in a fight with Menard Correc-
tional Center officers. The fight left Wilborn with bruises, a
laceration, and a dislocated shoulder. He sued the correc-
tional officers under 42 U.S.C. § 1983, alleging that they vio-
lated his Eighth Amendment rights by using excessive force
or by failing to intervene and prevent it. He also sued two
prison nurses for acting with deliberate indifference toward
his injuries.

The district court dismissed the claims against the nurses
before trial because Wilborn failed to exhaust administrative
remedies. The remaining claims were tried to the court. Wil-
born tried the case on his own, without a lawyer. Partway
through the trial, the district court granted judgment as a mat-
ter of law for one defendant officer. After the trial, the district
court issued written findings of fact and conclusions of law.
The court found that the officers were more credible than Wil-
born and his witnesses and entered judgment in favor of all
remaining defendants.

Wilborn appeals the court's dismissal of his claims against
the nurses for failure to exhaust administrative remedies and
the findings of fact and conclusions of law after the trial. He
also argues that the district court abused its discretion by fail-
ing to recruit counsel to assist him. We affirm.

I.  *Factual & Procedural Background*

   A.  *Wilborn's Attack and His Injuries*

On July 28, 2011 Wilborn was an inmate at the Menard
Correctional Center in Illinois. At around 4:20 p.m. that day,
defendant-officers William Johnson, Andrew Bennett, and
James Lloyd were preparing inmates to walk from the North
1 cell house to the chow hall for dinner. With the cell doors

open, Wilborn rushed out of his cell and attacked Johnson.[1] Bennett and Lloyd responded by taking Wilborn to the ground and ordering him to "cuff up." According to the officers, Wilborn did not comply and violently resisted.

The officers' testimony was generally consistent. Johnson, Bennett, and Lloyd testified that they took Wilborn to the ground fairly quickly after the struggle began. They said they ended up on top of Wilborn, who resisted restraints for two to three minutes by kicking, thrashing, and thrusting his head backwards at them. The officers uniformly described striking his major muscle groups (neck, shoulders, biceps, thighs) to gain compliance, but they denied striking his face. They described how Officer David Ealey arrived while Wilborn was still resisting and administered pepper spray before Wilborn was handcuffed. Lloyd and another officer then escorted Wilborn to North 2 to see a medical technician. The officers denied striking Wilborn after they had restrained him.

Wilborn told a very different story. He testified that he was compliant and in handcuffs when Ealey used the pepper spray. He also testified that the officers continued to beat him after restraining him, including on the walk from North 1 to North 2. His former cellmate supported his story, testifying that Wilborn never resisted and that the officers kicked and beat Wilborn after they cuffed him. Finally, Wilborn claimed that defendant Major William Rees observed the other offic-

---

[1] Wilborn testified that the officers, not he, initiated the attack. In a disciplinary report, the Illinois Department of Corrections found that Wilborn was the initial aggressor. That finding is binding in this appeal. *Edwards v. Balisok*, 520 U.S. 641, 646–48 (1997) (applying principles of *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994), to prison disciplinary decisions).

ers' conduct and failed to intervene. Rees testified to the contrary. He said that he arrived after the officers had restrained Wilborn. Rees said he observed that Wilborn had been pepper-sprayed and instructed the officers to take Wilborn to a medical technician.

After the altercation, medical staff at Menard examined Wilborn. They did not treat him for long, though, because later that day the Illinois Department of Corrections issued Wilborn a disciplinary ticket for the fight and transferred him to Tamms Correctional Center. Upon intake at Tamms, defendant nurses Lakeisha Hamby and Shelby Dunn evaluated Wilborn. They recorded his cuts and bruises, gave him acetaminophen, and told him to use his cell sink to clean up. They also noted that Wilborn's right shoulder appeared abnormal and that he complained of dislocation. Deciding this was not a major injury, they placed Wilborn on a list to see a doctor first thing the next day. Tamms staff then placed Wilborn in the infirmary overnight. He remained in significant pain.

Wilborn saw a doctor at Tamms the next morning. The Tamms doctor sent Wilborn to an outside hospital, where another doctor diagnosed and reduced Wilborn's dislocated right shoulder at about 3:00 p.m., almost twenty-four hours after the fight. Wilborn returned to the infirmary at Tamms and remained there until August 23, 2011.

B.   *This Federal Lawsuit*

In November 2012 Wilborn filed a *pro se* complaint in the Northern District of Illinois under 42 U.S.C. § 1983. The case was transferred to the Southern District of Illinois where the events occurred. Wilborn asserted nine counts against sixteen named defendants and numerous John Does alleging that

they violated his First and Eighth Amendment rights. After screening and severing claims under 28 U.S.C. § 1915A, the district court allowed the allegations in this case to proceed. Wilborn pursues four claims in this appeal: (1) his excessive force claim against the Menard officers; (2) his state-law battery claim against the same officers; (3) his deliberate indifference claim against Major Rees; and (4) his deliberate indifference claim against Tamms nurses Hamby and Dunn.

Nurses Dunn and Hamby moved for summary judgment on the ground that Wilborn had failed to exhaust administrative grievance procedures for his claims against them as required under the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). The district court held an evidentiary hearing under *Pavey v. Conley* ("*Pavey I*"), 544 F.3d 739 (7th Cir. 2008), to resolve the relevant factual disputes. After the hearing, the district court found that Wilborn failed to follow the administrative grievance process and dismissed the claims against Dunn and Hamby.

Throughout the pretrial phase of the lawsuit, Wilborn requested that the court recruit counsel for him under 28 U.S.C. § 1915(e)(1). The district court denied his requests until July 2014, when it agreed to try to recruit counsel. After contacting more than 400 attorneys over many months, the district court found a volunteer to be Wilborn's stand-by counsel at trial. Just shy of a month later, however, the volunteer counsel cited a scheduling conflict and the district court granted his motion to withdraw. Wilborn did not renew his request for recruited counsel, and the district court did not renew its search. Wilborn proceeded to trial *pro se*.

The district court held a bench trial on the remaining issues in April 2016. Wilborn began by testifying in narrative

form and then called seven witnesses: defendants Rees, Dunn, and Hamby; three inmates; and an external investigator. After Wilborn rested, the district court entered judgment as a matter of law for Rees. The defendant officers then testified on their own behalf. In its findings of fact, the district court found the officers more credible than Wilborn and his witnesses. The court also found that Wilborn's injuries were consistent with the officers' version of the fight and concluded that they used force in good faith and as reasonably necessary to restrain Wilborn. The court entered final judgment in favor of all defendants.

II.  *Analysis*

On appeal, Wilborn argues that the district court erred in four ways: first, by finding that he failed to exhaust administrative remedies against nurses Dunn and Hamby; second, by crediting the officers' version of the facts concerning their violent encounter; third, by granting judgment as a matter of law for Rees; and fourth, by failing to recruit another lawyer for him. We review each argument in turn and ultimately affirm.

A.  *Exhaustion of Administrative Remedies*

The Prison Litigation Reform Act required Wilborn to exhaust "such administrative remedies as are available" before suing the Tamms nurses for deliberate indifference to his pain. 42 U.S.C. § 1997e(a). The district court held an evidentiary hearing under *Pavey* to determine which administrative remedies Wilborn had pursued and when. After the hearing, the district court concluded that Wilborn failed to exhaust those remedies by missing a filing deadline without good cause. The court therefore dismissed the claims against

Tamms nurses Dunn and Hamby. Wilborn argues that he either met the deadline or had good cause for missing it. We reject both arguments.

1. *Standard of Review*

A preliminary question requires clarification. We have sometimes written that we review *de novo* a dismissal after a *Pavey* hearing, e.g., *Hernandez v. Dart*, 814 F.3d 836, 840 (7th Cir. 2016), but that is only part of the story. At *Pavey* hearings, judges may hear evidence, find facts, and determine credibility. *Pavey v. Conley* ("*Pavey II*"), 663 F.3d 899, 904 (7th Cir. 2011); *Pavey I*, 544 F.3d at 742. After finding facts, the district court may allow the claim to proceed or dismiss it for failure to exhaust. *Pavey I*, 544 F.3d at 742. If the defense is adjudicated on the basis of factual findings after a hearing, more general principles of federal civil procedure call for us to review the findings of fact only for clear error. *Pavey II*, 663 F.3d at 904; Fed. R. Civ. P. 52(a)(6); cf. *Philos Technologies, Inc. v. Philos & D, Inc.*, 802 F.3d 905, 911 (7th Cir. 2015) ("Factual findings related to the personal-jurisdiction issue are reviewed for clear error."); *Dr. Robert L. Meinders, D.C., Ltd. v. UnitedHealthcare, Inc.*, 800 F.3d 853, 856 (7th Cir. 2015) (when district court's decision to dismiss for improper venue "is based upon factual findings, our review is guided by the clearly erroneous standard"). Accordingly, in this case we review the district court's factual findings for clear error, but we review *de novo* the court's understanding of applicable law. *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005) (per curiam). We turn now to Wilborn's two arguments for avoiding the defense.

2. *Submission to Counselor*

This circuit has taken a strict approach to exhaustion. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). An inmate must comply with the administrative grievance process that the State establishes, at least as long as it is actually available to the inmate. *Id*. Before April 2017, Illinois required inmates to follow a three-step process before suing in federal court.[2] Step one required an inmate to address his complaint with a counselor. 20 Ill. Admin. Code § 504.810(a), as promulgated in 27 Ill. Reg. 6285–86 (April 11, 2003);[3] *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016). If that did not resolve the issue, the inmate proceeded to the second step by submitting a written grievance to a grievance officer within 60 days of the incident. 20 Ill. Admin. Code § 504.810(a)–(b); *Pyles*, 829 F.3d at 864. This filing deadline could be extended for good cause. 20 Ill. Admin. Code § 504.810(a). Here, Wilborn submitted his grievance to a counselor 57 days after the incident and to a grievance officer 101 days after the incident. The question is whether Wilborn complied with the second step.

The parties agree that Wilborn submitted his grievance to a counselor within 60 days. Despite our precedent to the con-

---

[2] Effective April 2017, Illinois amended its grievance procedures. See 41 Ill. Reg. 3909–10 (March 31, 2017) (amending 20 Ill. Admin. Code § 504.810). When Wilborn sued, the April 2003 version of the grievance procedures was in effect. See 27 Ill. Reg. 6285–86 (April 11, 2003) (promulgating the version of 20 Ill. Admin. Code § 504.810 in effect from April 2003 through April 2017). Throughout this opinion, we apply the April 2003 version of the regulations.

[3] All subsequent references to 20 Ill. Admin. Code § 504.810 are to the version effective April 2003, as promulgated in 27 Ill. Reg. 6285–86.

trary, Wilborn insists that this was enough to exhaust available administrative remedies. Under the regulations in effect then, we have clearly held, an Illinois inmate must submit his grievance to a grievance officer, not only to a counselor, by the deadline. *Owens v. Hinsley*, 635 F.3d 950, 953, 955 (7th Cir. 2011) (affirming dismissal for failure to exhaust when inmate submitted grievance to counselor within three days, but not to grievance officer within 60 days).[4]

### 3. *Good Cause*

Even if his grievance was submitted too late, Wilborn argues that he had good cause for missing the deadline by 41 days. Illinois extends the filing deadline when an inmate has good cause for delay. 20 Ill. Admin. Code § 504.810(a). Good cause in this context "is a flexible, equitable" standard that excuses delay when it is "occasioned by something that is not within" the inmate's control. *Pyles*, 829 F.3d at 865, 866.

Wilborn points to the following facts as good cause: that he remained in the infirmary to recover from his injuries (26

---

[4] We have recognized one exception, but Wilborn presents no facts to support its application here. In *Curtis v. Timberlake*, 436 F.3d 709 (7th Cir. 2005), we held that an inmate could exhaust by complying with an accepted alternative procedure. To meet this exception, the inmate must show that the prison established, through regular practice, an alternative procedure not reflected in the written rules. *Id*. at 712. In this case, the district court heard evidence on this question at the *Pavey* hearing, including testimony from the grievance officer who handled Wilborn's complaint. The court found the officer credible and concluded that Tamms did not allow inmates to meet the deadline by submitting a grievance to a counselor instead of a grievance officer. Wilborn does not identify any evidence that contradicts this finding. The court did not clearly err by finding that there was no alternative procedure. *Curtis*, 436 F.3d at 711 (whether the prison follows an alternative procedure is a question of fact).

days); that his first submission to his counselor was lost in the prison mail (5 days); that his counselor did not respond to his informal complaint right away (8 days); and that he wanted to make a photocopy (31 days). Because his grievance was submitted to the grievance officer 101 days after the incident (i.e., 41 days late), Wilborn must demonstrate good cause for a period of at least 41 days.

Defendants Dunn and Hamby agree that Wilborn should be credited for the time the grievance spent lost in the prison mail system and on the counselor's desk. But this explains only 13 of the 41 days that Wilborn delayed beyond the deadline, leaving 28 days unexplained. His stay in the hospital (26 days) is not sufficient alone to show good cause. To prove that he exhausted the administrative process, then, Wilborn must show that his desire to make a photocopy (31 days) excuses him from the 60-day deadline.

Physical incapacitation can be good cause for delay. *Hurst v. Hantke*, 634 F.3d 409, 412 (7th Cir. 2011). To survive summary judgment on this basis, however, Wilborn needed to provide evidence that he was "physically unable to pursue" administrative remedies while in the infirmary. *Id*. Wilborn has not done that. He insists that he was unable to work from the infirmary without explaining why or citing any evidence. He has not shown, for example, that he lacked access to the grievance forms or that his injuries prevented him from researching or writing. And as the district court noted, Wilborn submitted a grievance about a different issue the day after he left the infirmary. Wilborn does not explain why he could complete that grievance promptly, but not this one.

Similarly, waiting for photocopying is not a sufficient excuse here. In *Pyles v. Nwaobasi*, 829 F.3d 860 (7th Cir. 2016), we

found good cause when the inmate reasonably believed that the library would return his original and photocopied grievance within the 60-day window. *Id*. at 866. Importantly, the inmate in that case requested a copy from the library as soon as he could and filed it the day he received it back. *Id*. The library took 13 days to make the photocopy, however, which caused the inmate to miss the filing deadline by two days. *Id*. at 865, 866. Wilborn points to no comparable facts here. We know only that Wilborn received a response from his counselor on October 6, 2011 and did not submit the grievance to a grievance officer until November 6, 2011. Sometime during those 31 days, Wilborn made a photocopy. That is not enough to show good cause. We therefore affirm the district court's decision to dismiss Wilborn's claims against nurses Dunn and Hamby for failure to exhaust.

B. *Cruel and Unusual Force?*

Correctional officers violate the Eighth Amendment when they use force not "in a good faith effort to maintain or restore discipline," but "maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992), quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986). Here, the correctional officers testified that they used force after Wilborn attacked them and stopped once they handcuffed him. The district court found that the officers were credible and that they used only the force needed to restrain Wilborn and restore safety. Accordingly, the court concluded that the officers did not violate the Eighth Amendment by using cruel or unusual force. Wilborn challenges these factual findings, which we review under the clearly-erroneous standard. We will overturn them only if the entire record leaves us "with

the definite and firm conviction that a mistake has been committed," giving due deference to the district court's better opportunity to see and hear the witnesses. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985), quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

We give "even greater deference to" findings that are based on witness credibility. *Anderson*, 470 U.S. at 575. This is a high hurdle, but we could reverse if the credited testimony were "facially implausible" or "contradicted by extrinsic evidence." *Ortiz v. Martinez*, 789 F.3d 722, 729 (7th Cir. 2015), quoting *Anderson*, 470 U.S. at 575. Wilborn insists that his documented injuries are inconsistent with the officers' testimony. The fight caused bruising, abrasions, and swelling on Wilborn's face and a cut above his right eye. An inmate testified that Wilborn also had black eyes and a broken tooth. Yet all defendants denied striking Wilborn in the face, testifying that they struck only his major muscle groups (neck, shoulders, biceps, thighs) as they are trained to do. This testimony, Wilborn argues, is implausible given his facial injuries.

The district court found that Wilborn's injuries were consistent with the officers' account. This conclusion was not clearly erroneous. The officers testified that they tackled Wilborn and landed on top of him on the ground. They described wrestling with Wilborn for two to three minutes while he resisted by kicking, thrashing, and thrusting his head backwards at them. Wilborn was moving his head so violently that he caused Officer Ealey, who was trying to hold Wilborn's head still, to cut his wrist on a nearby box fan. It was reasonable to infer from this testimony that Wilborn sustained his injuries, including the facial injuries, when officers tackled him and wrestled him into submission. See *United States v.*

*Johnson*, 437 F.3d 665, 675 (7th Cir. 2006) (credibility determination not clear error if testimony was "neither physically impossible nor contrary to the laws of nature").

In the alternative, Wilborn proposes a second version of the events. He claims that if the officers never struck him in the face during the initial altercation, then they must have hit him on the walk to the North 2 medical wing. To make this point, Wilborn relies on defendant Rees's testimony. Rees testified that he arrived on the scene after the officers had restrained Wilborn. He observed that Wilborn had been pepper sprayed but did not notice any other injuries. To Wilborn, this observation proves that the officers must have inflicted the facial injuries *after* Rees saw them leave North 1—that is, while the officers escorted Wilborn in handcuffs to see a medical technician in North 2.

Wilborn's argument is plausible, but this testimony is not enough to show the court's findings were clearly erroneous. Bruises and swelling can take time to manifest, which may explain why Rees did not see them immediately after the fight. It is also plausible that Rees could see the general effects of pepper spray without noticing a small laceration above one eye. It was not clearly erroneous for the district court to credit the officers' testimony that they did not strike Wilborn after restraining him.

Finally, Wilborn points to minor inconsistencies in the officers' testimony to argue that they were not believable. "Witnesses are not incredible as a matter of law simply because they have been impeached on trivial, irrelevant matters." *United States v. Jensen*, 169 F.3d 1044, 1047 (7th Cir. 1999). And that is the case here. The discrepancies Wilborn identifies do not make the officers' testimony "exceedingly improbable."

*Id*. The district court did not clearly err when it found that the officers used lawful force to subdue Wilborn.

    C.  *Judgment as a Matter of Law for Rees*

An officer who fails to intervene to try to prevent known cruel or unusual force, despite a reasonable opportunity to do so, may be held liable under § 1983. See *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). According to Wilborn, Rees witnessed the other officers beating him both in the North 1 cell house and later in the North 2 medical wing. Based on this account, Wilborn argues that Rees violated the Eighth Amendment by failing to intervene and prevent the abuse. At the close of Wilborn's case, the district court found that Wilborn had not presented sufficient evidence that Rees knew of any excessive force, so it granted judgment as a matter of law for Rees. In its post-trial conclusions of law, the district court repeated that if it had not granted judgment as a matter of law when plaintiff rested, it would have ordered judgment in Rees's favor after trial because it found no underlying excessive force that could be cruel and unusual punishment under the Eighth Amendment.

Wilborn challenges that decision on appeal, arguing (1) that Wilborn's own testimony proved that Rees was aware of the unlawful use of force, and (2) that the district court cited the wrong Federal Rule of Civil Procedure. Both arguments fail. Because we uphold the district court's factual findings, there was no underlying unlawful force for Rees to witness. And even though the district court cited Rule 50(a), which applies to jury trials, instead of Rule 52(c), the rule for bench trials, mistakenly citing the more favorable standard could not have prejudiced Wilborn. *Ortloff v. United States*, 335 F.3d 652, 660 (7th Cir. 2003). Rule 50(a) requires the court to consider

the evidence in the light most favorable to the non-moving party, while Rule 52(c) allows the court to weigh the evidence and determine witness credibility. See *id.* Thus even if the court's mistake was more than a slip of the judicial pen and the court applied the wrong standard, this could not have harmed Wilborn. We affirm judgment as a matter of law in favor of Rees.

D.  *Recruitment of Counsel*

In civil cases, a district court may recruit "an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915(e)(1). The court cannot appoint counsel in civil cases but must rely on the generosity of lawyers to volunteer their time and skill on behalf of indigent civil parties. *Mallard v. United States Dist. Court for the Southern Dist. of Iowa*, 490 U.S. 296, 310 (1989). Whether to seek a volunteer attorney is a matter of the court's discretion. *Pruitt v. Mote*, 503 F.3d 647, 658 (7th Cir. 2007) (en banc).

Here, the district court decided before trial that Wilborn needed counsel. The court then searched for months before finding a volunteer. The district court later permitted the volunteer to withdraw instead of accommodating his schedule. (The record does not explain that choice.) Wilborn did not renew his request for recruitment, and the court did not renew its search. Wilborn argues on appeal that the district court abused its discretion when it did not try to find a replacement lawyer.

As we have emphasized before, § 1915(e)(1) does not create a right to counsel in civil cases. *Dupree v. Hardy*, 859 F.3d 458, 462 (7th Cir. 2017); *Pruitt*, 503 F.3d at 657–58. That a court decides to recruit a volunteer does not create a right either.

Nor does it mean that the court has an indefinite commitment to search until a volunteer is found. The help of recruited lawyers is a valuable resource but a limited one. Demand often exceeds supply, especially when marginal costs are zero or minimal. (Wilborn has pursued four separate suits against more than sixteen defendants related to this incident.) Given this dynamic, identifying a volunteer is not always possible, especially for cases outside of major metropolitan areas. There are limits to what a court must do after deciding to recruit counsel.

The court did not abuse its discretion by failing to find a second volunteer here. Over a span of eighteen months, the district court contacted over 400 attorneys. The docket shows that the district court renewed its search at least three times, albeit without much success. These efforts were more than enough to satisfy any duty to the indigent plaintiff. The district court also offered to postpone the trial, either to allow Wilborn to prepare better or to find another volunteer. Wilborn declined. He cannot now claim that the court abused its discretion by allowing him to proceed *pro se*.

Finally, Wilborn argues in his reply brief that the district court abused its discretion when it denied his original three requests for recruitment. We do not consider arguments raised for the first time in a reply brief. *Dixon v. Page*, 291 F.3d 485, 489 (7th Cir. 2002). Even if we did, the district court applied the two relevant factors—the litigant's ability and the case's complexity—and reached a reasonable conclusion. The court thus did not abuse its discretion. *Pruitt*, 503 F.3d at 649–50.

The judgment of the district court is AFFIRMED.