# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 05-2999

CHRISTOPHER J. SCARVER,

*Plaintiff-Appellant,*

*v.*

JON LITSCHER, *et al.,*

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 01-C-0497-C—**Barbara B. Crabb**, *Chief Judge.*

_____

ARGUED DECEMBER 8, 2005—DECIDED JANUARY 18, 2006

_____


Before BAUER, POSNER, and KANNE, *Circuit Judges.*

POSNER, *Circuit Judge.* The plaintiff in this prisoner's civil rights suit, Christopher Scarver, contends that officials of the Wisconsin Secure Program Facility—nicknamed "Supermax"—violated his constitutional right not to be subjected to cruel and unusual punishment. ("Supermax" actually is a generic term for "facilities or units designated for inmates who have been disruptive or violent while incarcerated and whose behavior can be controlled only by separation, restricted movement, and limited direct access to staff and other inmates, thereby excluding routine disciplinary segregation, protective custody, or other

routine purposes." Leena Kurki & Norval Morris, "The Purposes, Practices, and Problems of Supermax Prisons," 28 *Crime & Justice* 385, 388 (2001).) The district judge, after dismissing several of the defendants, held that a jury could reasonably find that the remaining ones had violated Scarver's constitutional right by subjecting him to conditions of confinement that had significantly aggravated his mental illness. But she granted summary judgment for these defendants anyway on the ground of qualified immunity: settled law did not, she ruled, establish the unlawfulness of their behavior. We address the merits, and will not have to consider immunity.

Scarver is schizophrenic and delusional, and, unlike most schizophrenics, extremely dangerous. He has murdered three people, two of them in prison in 1994. One was the notorious Jeffrey Dahmer—the cannibal murderer of 17 young men. Scarver, who hears voices constantly, claimed that God had ordered him to commit the murders. At the time, he was in Wisconsin's Columbia Correctional Institution, where he twice attempted suicide, once by setting fire to himself. The year after the two murders, he was transferred (after a brief sojourn in the U.S. Medical Center for Federal Prisoners in Springfield, Missouri, for a psychiatric evaluation) to the federal prison at Florence, Colorado, the most secure prison in the federal system. The Wisconsin prison authorities didn't think they had a secure enough prison to protect inmates and staff from him.

Scarver spent five years in the federal prison at Florence, and was surprisingly well behaved. He was given audiotapes to help quiet the voices in his head, worked, and was permitted daily contact with other inmates in the prison's recreation yard, all without incident. At the end of this for him happy interlude he was returned to Wisconsin at the request of one of the defendant officials and interned in the

then-new Supermax facility in Boscobel, Wisconsin. The defendants believed that this facility was secure enough to hold him. But after three years there, and after the district court had determined in a preliminary-injunction hearing that "conditions at Supermax are so severe and restrictive that they exacerbate the symptoms that mentally ill inmates exhibit" and that "many of the severe conditions serve no legitimate penological interest; they can only be considered punishment for punishment's sake," *Jones 'El v. Berge*, 164 F. Supp. 2d 1096, 1116-17 (W.D. Wis. 2001) (see 374 F.3d 541 (7th Cir. 2004), for a subsequent stage of the case), Scarver was sent back to Colorado, though this time to a state prison, where he is being allowed to mingle with other inmates just as he was at the federal prison in Florence. The staff at the state prison does not regard him as a management problem. However, he had been there for only a brief time before the record of this case closed. His complaint is about his treatment at Supermax.

The facility has several degrees of restrictiveness, called "levels." Inmates spend their first 30 days on Level One, where they are locked in windowless single-person cells for all but four hours of the week; the four hours are for recreation in a small windowless room not much larger than the cells. The cells are illuminated 24 hours a day so that the guards can watch the inmates, although they glance in only intermittently. The cells are not air-conditioned, and so, being windowless, they become extremely hot during the summer—the heat index sometimes rises above 100 degrees, and often above 90. The inmates are not allowed to have mechanical or electronic possessions, such as a television set, a clock, or even a watch—just one religious text, one box of legal documents, and 25 personal letters.

The inmate who behaves himself during his initial 30-day stay at Level One is transferred to Level Two, where he has slightly better conditions and more privileges; and from

there he can move by successive promotions based on good behavior to Level Five and then out of Supermax altogether, to a less restrictive prison, though given Scarver's history it is doubtful whether he could have progressed that far no matter how well he had behaved. And in any event mentally ill prisoners have great difficulty behaving and therefore getting promoted, or if promoted (rarely beyond Level Two) staying at their new level, since misbehavior leads to demotion; so they end up spending most of their time at Level One.

The heat of the cells during the summer interacted with Scarver's antipsychotic drugs to cause him extreme discomfort; antipsychotic medication puts a person at risk of heat stroke, dangerously low blood pressure, and a rare and often fatal heat-related disease called neuroleptic malignant syndrome (NMS). The constant illumination of the cells disturbs psychotics. And without audiotapes or a radio or any other source of sound Scarver could not still the voices in his head. He attempted suicide twice, once by taking an overdose of his antipsychotic pills and the other time by swallowing a large number of Tylenol tablets. On several occasions he banged his head against the cell wall for protracted periods, telling a prison psychologist that he wanted to break his head open so that the voices could escape. He also cut his head with a razor in an effort to cut out whoever or whatever was talking and moving around inside his head. On another occasion he cut his wrists. His symptoms would worsen when he stopped taking his antipsychotic medication, which he would do when the heat of his cell interacted with the medication to cause him serious distress.

It is a fair inference that conditions at Supermax aggravated the symptoms of Scarver's mental illness and by doing so inflicted severe physical and especially mental

suffering. He was closely watched and so the defendants were well aware of his problems. Their reactions were at times bizarre, as when they denied him a promotion to a higher level because "the incident of you banging your head on the wall and other bizarre behavior is not appropriate. We highly recommend that you cooperate w/ clinical services so that advancement can be considered in the future." He was banging his head because he is crazy, not because he was unwilling to cooperate.

There is no evidence, however, that defendants knew when they brought Scarver back from Florence because they now had a secure enough facility to house him safely that he would be at risk of severe distress. Probably they should have known, but that would make them guilty merely of negligence and not of deliberate indifference (the mental state required to establish an Eighth Amendment violation), which would require proof that they were conscious of the risk. *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994); *Case v. Ahitow*, 301 F.3d 605 (7th Cir. 2002). Of course they soon realized that Scarver was in serious distress because of his mental illness. But there is no indication that they attributed this to the heat of the cell, the constant illumination of the cell, or the denial of audiotapes or similar equipment—no evidence in short that they realized the harm that the conditions of his confinement were inflicting on him. They were not indifferent to his welfare. They gave him constant psychiatric attention, plied him with antipsychotic medication, and through close surveillance thwarted his two suicide attempts. They did not know what more to do. There is no indication that they had detailed knowledge of the program at Florence for homicidal maniacs (nor has Scarver's lawyer favored us with a description of it) and they state without contradiction that Florence had not forwarded any of its records of Scarver's conduct there to

the Wisconsin authorities, who may not have known that he had behaved better at Florence than he was behaving at Supermax. The warden of Supermax had, it is true, interviewed Scarver at Florence and had learned a little about him from the warden there; but while the warden did not mention any misconduct by Scarver he did comment, enigmatically, that "Mr. Scarver has, has a dark side."

The Supermax officials might have been expected eventually, at some point during Scarver's three years there, to realize that the heat, the constant illumination, and the lack of sound were adverse conditions that the medication couldn't completely offset (especially given the interaction of the medication with the heat) and that created a substantial risk of causing Scarver serious physical and mental suffering. There is an extensive literature on the effect of such conditions, particularly of isolation, on mentally disturbed prisoners. E.g., Jennifer R. Wynn & Alisa Szatrowski, "The Modern American Penal System: Hidden Prisons: Twenty-Three-Hour Lockdown Units in New York State Correctional Facilities," 24 *Pace L. Rev.* 497, 512-14 (2004); Craig Haney, "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," 49 *Crime & Delinquency* 124 (2003); Stuart Grassian, "Psychopathological Effects of Solitary Confinement," 140 *Am. J. Psychiatry* 1450 (1983), and references in *Madrid v. Gomez*, 889 F. Supp. 1146, 1231 (N.D. Cal. 1995). Some of the literature postdates Scarver's detention in the Supermax and thus is irrelevant to what the defendants knew when he was there, but much of it is earlier. Although we know from the *Jones 'El* opinion that the defendants had a copy of Grassian's article, Scarver's lawyer has not contested the defendants' denial that they knew that the conditions of confinement at the Supermax prison would aggravate Scarver's mental disease and has not argued that the literature was so widely

disseminated in correctional circles that it is a fair inference that despite their denials they did know that.

What is more, the treatment of a mentally ill prisoner who happens also to have murdered two other inmates is much more complicated than the treatment of a harmless lunatic. Cf. *Anderson v. County of Kern*, 45 F.3d 1310, 1314-15 (9th Cir. 1995). Measures reasonably taken to protect inmates and staff from him may unavoidably aggravate his psychosis; in such a situation, the measures would not violate the Constitution. It was when Scarver was permitted to mingle with other inmates at the Columbia Correctional Institution that he killed two of them. Maybe there is some well-known protocol for dealing with the Scarvers of this world, though probably there is not (we have found none, and his lawyer has pointed us to none); fortunately they are few in number. Scarver has presented no evidence concerning the techniques that the two prisons in Colorado use to allow a dangerous prisoner to mingle with other inmates without endangering them or staff. Dahmer, who doubtless would have been executed in any state that retains the death penalty, was a unique target. The other inmate whom Scarver murdered was not; the motive there may have been that the inmate had tried to pin his crime on a black man (Scarver is black). Race may also have played a role in Scarver's decision to murder Dahmer, many of whose victims were black. Other white inmates—at least those whom Scarver perceives to have wronged blacks—might also be at risk of being attacked and perhaps killed by him.

The murderous ingenuity of murderous inmates, especially in states such as Wisconsin that do not have capital punishment, so that inmates who like Scarver are already serving life terms are undeterrable, cannot be overestimated. See, e.g., *Schlup v. Delo*, 513 U.S. 298, 301-02 (1995); *Westefer v. Snyder*, 422 F.3d 570, 575 (7th Cir. 2005); *United*

*States v. Tokash*, 282 F.3d 962, 965 (7th Cir. 2002); *Bruscino v. Carlson*, 854 F.2d 162, 164 (7th Cir. 1988); *United States v. Fountain*, 768 F.2d 790 (7th Cir. 1985); *United States v. Silverstein*, 732 F.2d 1338, 1341-42 (7th Cir. 1984); *Allen v. Woodford*, 366 F.3d 823, 831-33 (9th Cir. 2004); *Shrader v. White*, 761 F.2d 975, 982 (4th Cir. 1985). Prison authorities must be given considerable latitude in the design of measures for controlling homicidal maniacs without exacerbating their manias beyond what is necessary for security. It is a delicate balance. "Federal judges must always be circumspect in imposing their ideas about civilized and effective prison administration on state prison officials. The Constitution does not speak with precision to the issue of prison conditions (that is an understatement); federal judges know little about the management of prisons; managerial judgments generally are the province of other branches of government than the judicial; and it is unseemly for federal courts to tell a state . . . how to run its prison system." *Duran v. Elrod*, 760 F.2d 756, 759 (7th Cir. 1985); see also *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

It may be necessary to separate measures taken to protect inmates and staff from a homicidal inmate from conditions that inflict serious suffering without any security rationale. (We say "may be" because the two types of condition may not be separable in practice.) Had the defendants realized the risk of serious harm to Scarver that was created by extreme heat (interacting with his antipsychotic medication) and the denial of audiotapes, their decision to disregard *that* risk probably could not have been justified by his dangerousness. Those aspects of his confinement did not protect other inmates or guards from Scarver or Scarver from himself, although the heat—conceivably even the prohibition of audiotapes—may have been an indirect result of trying to prevent prisoners from fashioning weapons from fixtures, perhaps including

air-conditioning vents and control, or from other materials, in the cell. The constant illumination of his cell may have had a security rationale as well; it reduced the likelihood that Scarver would use the cloak of darkness to attempt suicide or make a weapon of some sort. In any event, as we noted earlier, Scarver has failed to cite evidence to overcome the defendants' denials that they knew these conditions were making his mental illness worse.

AFFIRMED.


A true Copy:

Teste:


_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*