In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3077

BRUCE GILES,

*Plaintiff-Appellant,*

*v.*

SALVADOR A. GODINEZ, Acting Director, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:12-cv-00965 — **J. Phil Gilbert**, *Judge.*

ARGUED NOVEMBER 8, 2018 — DECIDED JANUARY 29, 2019

Before FLAUM, MANION, and ST. EVE, *Circuit Judges.*

MANION, *Circuit Judge*. Bruce Giles is a prisoner in the custody of the Illinois Department of Corrections (the "Department") who suffers from schizoaffective disorder. Giles filed this action pro se under 42 U.S.C. § 1983 against several Department officials. He alleges the defendants violated his rights under the Eighth Amendment by being deliberately indifferent to his serious medical needs, subjecting him to unconstitutional conditions of confinement, and failing to

protect him from other inmates. The district court granted summary judgment to the defendants and Giles now appeals. The district court's conclusion was based largely on its holding that Giles could not establish the subjective elements of his claims because the defendants, who are all non-medical officials, appropriately relied on the judgment of medical professionals. Because we agree Giles cannot establish the defendants possessed a sufficiently culpable state of mind, we affirm.

## I.  Background

### A.  Factual Background

At all times relevant to this appeal, Giles was in the custody of the Department and housed in five different correctional facilities: Dixon Correctional Center ("Dixon"), Illinois River Correctional Center ("Illinois River"), Stateville Correctional Center ("Stateville"), Pontiac Correctional Center ("Pontiac"), and Lawrence Correctional Center ("Lawrence"). He suffers from schizoaffective disorder. His symptoms include anxiety, depression, auditory hallucinations, and suicidal ideation. He attempted suicide at least three times while in the Department's custody. He has at various times been prescribed psychotropic medications that help him cope with these symptoms but do not eliminate them entirely.

Giles's claims arise out of the medical treatment he received and the conditions of his confinement at multiple correctional facilities over a two-year period. Most of his complaints relate specifically to his placement in segregation.[1] The

---

[1] Although Giles's placement in segregation is at the core of his complaint, the exact duration of his periods in segregation and the nature of segregation placement at each facility are not clear from the record or

following timeline of events is compiled from Giles's allegations, his medical records, and his deposition testimony.

From late June 2010 until September 2010, Giles was housed at Dixon, where he alleges he had daily access to mental health professionals and the opportunity to participate in therapeutic programs.[2] On September 22, 2010, Giles was transferred from Dixon to Illinois River. According to the health status transfer summary prepared by an official at Dixon at the time of Giles's transfer, Giles's prescription for psychotropic medications (Prozac and Depakote) had been discontinued on July 23, 2010, about two months before he left Dixon.

Giles was examined by a nurse at Illinois River on October 3, 2010, at which point he requested to see a psychologist because he wanted to get back on his medications. The nurse noted he was "upset that [he] cannot see psych today." Three days later, on October 6, Giles was transferred to Stateville due to an unrelated legal proceeding. On October 9, while Giles was at Stateville, a psychiatrist again prescribed Prozac and Depakote, less than a week after he requested the return to medication.

---

Giles's allegations. As best as can be discerned, Giles was placed in segregation during two separate periods and at three different facilities: first, at Illinois River and Pontiac from March 2011 to approximately July 2011 (he was transferred to Pontiac in April), and second, at Lawrence from February 2012 until approximately November 2012.

[2] Giles acknowledged in his deposition that he did not avail himself of these programs, however, until he returned to Dixon after filing this suit.

Giles was sent back to Illinois River on November 10, 2010. This time, his transfer summary failed to include the fact that he was receiving psychotropic medications, resulting in a lapse of medication. Giles was examined by a mental health counselor on November 22 and then by a psychiatrist on November 25. The psychiatrist again prescribed Prozac and Depakote and requested Giles's medical records from Stateville. Giles was examined by a medical health counselor on December 8. On December 12, a psychiatrist reviewed Giles's medical records from Stateville and noticed Giles had received Prolixin while there and his symptoms had improved, so Giles was placed back on Prolixin.

Giles was examined by a mental health counselor on ten different occasions from December 2010 until April 2011. He was also examined by a psychiatrist and attended group therapy sessions multiple times in January until he stopped showing up for the sessions in February.

Giles complained to a mental health counselor in March 2011 that he was not doing well and that he had not received his Prolixin medication for two days. The counselor wrote in his report that he addressed the medication issue with the prison pharmacy. Around this time, Giles had an altercation with another inmate at Illinois River. According to Giles's deposition testimony, the incident occurred when he was talking to himself and another inmate approached him, told him to shut up, and spit in his face. Giles pushed the inmate away. He claims the reason he was talking to himself was because he had not received his Prolixin medication, which helps control the voices in his head.

Because of the altercation, Giles was placed in segregation. According to Giles, while in segregation "you're just thrown

in a cell all day with other inmates that are violent, that don't care about you." He claims he was subjected to violence from other inmates in segregation but that he never reported this to prison officials. He testified inmates in segregation were given yard time, but that he sometimes chose not to go because he did not feel safe in the yard, claiming "that is where usually everybody fights."

After being placed in segregation in March 2011, Giles attempted suicide by cutting his wrists on his bed frame. His testimony indicates his cousin had passed away around this time and that his cellmate would not let him sleep at night. He also testified his symptoms were "just getting so bad," particularly the voices in his head, even though he acknowledges he was receiving his medications at this time. The stress from these combined factors led to his suicide attempt. Giles's cellmate notified the prison staff and Giles was rescued. After this, he was placed on suicide watch and was examined by mental health professionals.

Giles was examined by a mental health counselor on April 1 and April 8, 2011. The counselor noted there was "potential for exaggeration of symptoms" and that Giles was "coherent" with "no overt distress."

Giles was again transferred from Illinois River on April 13, 2011, this time to Pontiac. He remained in segregation at Pontiac. While at Pontiac, Giles alleges he received medication and one-on-one therapy, to "try to give [him] a little hope." He felt this treatment was insufficient. He alleges he was not given his medications "about twice." A psychiatrist discontinued Giles's existing prescriptions and prescribed new psychotropic medications on April 26. Three days later, Giles was again examined by a psychiatrist who noted "there is nothing

to contraindicate continued segregation placement at this time."

Giles received an extended interview with a psychiatrist on May 24, 2011. During this session, Giles stated he was "fine, except that [he had] not been getting [his] Prolixin." The psychiatrist noted Giles's mood was good; he was awake, alert, and oriented; he displayed "[n]o acute distress/agitation"; his speech was "fluent and coherent"; and his "thoughts were organized." Giles denied having any suicidal or homicidal thoughts. Besides claiming he had not been receiving Prolixin, "[h]e made no mention of any other serious concerns." Giles was still in segregation at this time.

Giles was scheduled for another psychiatric appointment on July 5, 2011, which he did not attend, opting to go to the prison yard instead. He was evaluated by a mental health professional on July 29, who again noted "there is nothing to contraindicate continued segregation placement at this time." As best as can be discerned from the record, Giles was removed from segregation sometime during July 2011.

Giles was transferred to Lawrence in early September 2011. He was examined by mental health professionals three times in September, four times in October, twice in November, twice in December, and three times in February 2012. After one of the October examinations, the mental health professional determined Giles was having issues with his cellmate and his cell assignment was exacerbating his symptoms. As a result, Giles was assigned a new cell and cellmate the next day. Notes from his examination the following week indicate "notable improvement."

In February 2012, Giles was involved in another alterca-
tion with an inmate, which formed the basis of his original
failure-to-protect claim. This altercation occurred when he ac-
cidentally bumped into the other inmate in the mess hall
while talking to himself. The other inmate assumed Giles was
talking to him and struck him in retaliation. Giles was ren-
dered unconscious by the attack. Giles testified in his deposi-
tion he had never had trouble with this inmate before and
never told the facility staff he felt he was in danger, but that
"it happened because of my symptoms. I was there, and [the
other inmate] just happened to be aggressive." During the in-
vestigation of the altercation, when he was asked (apparently
by prison officials) if he was "guilty," Giles alleges he simply
responded he was. As a result, both Giles and the other inmate
were placed in segregation. Giles apparently stayed in segre-
gation from February until November 2012.

Giles was examined by mental health professionals nine
more times during the period spanning from March to July
2012. During this time, he expressed his unhappiness at Law-
rence, his unhappiness with being in segregation, and the
anxiety he felt regarding the possibility of future altercations.
Giles reported difficulties with cellmates and frequently re-
quested reassignment. The mental health professionals noted
Giles lacked focus during treatment sessions and often did
not complete assigned therapy homework.

Throughout the two years at issue, Giles filed at least nine-
teen grievances. His complaints related to insufficient medical
treatment, delays or interruptions in receiving medication,
unconstitutional conditions of confinement, lack of adequate
suicide prevention, vermin infestations, his unhappiness in
segregation, and other issues. He alleges all these grievances

were either ignored outright or, if reviewed, his concerns were not addressed. He testified in his deposition, however, that he did not know whether the grievances were reviewed or investigated. We know from the record that at least three of these grievances (filed in March 2012, April 2012, and July 2012) were subjected to "Emergency Review" by Marc Hodge (the warden at Lawrence). The record also includes responses to many of Giles's appeals of his grievances alleging that he was not receiving his medication, that segregation placement was not conducive to his mental health, and that the facilities lacked proper mental health programs. These appeals were all denied, as the Department's Administrative Review Board (the "ARB") determined, "[b]ased on a total review of all available information," that the complaints were without merit.

Giles was eventually transferred back to Dixon in early 2014.

## B. District Court Proceedings

Giles filed this suit pro se on September 4, 2012. He named several defendants, nine of which remain in the case at this stage: S.A. Godinez (the Department's acting director during the relevant time period), Richard Birkey (the warden at Illinois River), Leonta Jackson (the assistant warden at Illinois River), Ron Zessin (the clinical services supervisor at Illinois River), Randy Pfister (the warden at Pontiac), Michael Lemke (the assistant warden at Pontiac), Marc Hodge (the warden at Lawrence), Mark Storm (the assistant warden at Lawrence), and Randy Stevenson (the clinical services supervisor at

Lawrence).[3] Giles asserted three claims under the Eighth Amendment, seeking to hold the defendants liable for these alleged constitutional violations pursuant to 42 U.S.C. § 1983. First, he asserted a claim of deliberate indifference to serious medical needs based on his allegations of inadequate treatment and delays in providing medication at Illinois River, Pontiac, and Lawrence. Second, he asserted a conditions-of-confinement claim based on his allegations of vermin infestations and unsanitary conditions while in segregation at Pontiac and Lawrence. Third, he asserted a failure-to-protect claim based on the February 2012 altercation.

The case was referred to a U.S. magistrate judge in late 2012, with Giles's consent. The defendants moved for summary judgment in June 2014. The magistrate judge issued a Report & Recommendation (R&R) and recommended granting summary judgment on the ground that Giles failed to show deliberate indifference. After a *de novo* review of the R&R and Giles's objections thereto, the district court adopted the R&R in its entirety and granted summary judgment to the defendants.

Throughout the district court proceedings, Giles filed multiple motions to appoint counsel. He first filed such a motion on September 4, 2012. The magistrate judge denied the motion because Giles had not demonstrated that he had attempted to find counsel on his own. On December 17, Giles filed a motion to reconsider his motion to appoint counsel after attempting unsuccessfully to find an attorney. The magistrate judge again denied the motion, holding that the issues in the case were not

---

[3] Five other defendants, also Department officials, were dismissed by the district court in November 2012.

factually complex because discovery had been limited at that time to only the issue of exhaustion of administrative remedies. The court held that Giles was competent to litigate on his own at that stage. Giles filed another motion to appoint counsel on July 2, 2013. The court reaffirmed its previous decision that Giles appeared competent to litigate the case at the current stage and stated that the issue of appointing counsel would not be reconsidered until after the resolution of the administrative remedies issue.

In August 2013, after the defendants' deadline to raise a failure to exhaust administrative remedies defense had expired, Giles once again moved the court to appoint counsel for him. The magistrate judge construed the motion as a motion for recruitment of counsel and granted it, noting that the court has no authority to appoint counsel in § 1983 cases but can seek to recruit a volunteer attorney. *See Navejar v. Iyiola*, 718 F.3d 692, 696 (7th Cir. 2013). The district court circulated a request for representation to the court's list of "approximately 50 licensed and registered attorneys that have indicated an interest in representing indigent litigants in this district." However, no attorneys were willing and available to represent Giles immediately.

Giles moved in February 2014 for additional time to seek counsel. Giles argued he needed legal assistance to "prepare documents, for dispositive motions, and discovery." The magistrate judge denied the motion because Giles had not specified a deadline for the extension request, but he stated he would continue to seek a volunteer to represent Giles. Giles filed another motion to recruit counsel in May 2014. The magistrate judge denied the motion as moot, having already granted the earlier motion to recruit, but once again solicited

volunteers from the pro bono list. Giles moved for recruitment of counsel again in August 2014 while summary judgment was pending. The magistrate judge again explained that the motion to recruit counsel had previously been granted and that the court had done all it could to solicit a volunteer. Giles's case was published to the list of volunteers a third time. The magistrate judge encouraged Giles to continue litigating the case to the best of his ability. Finally, Giles filed a motion to appoint counsel once again in December 2014, which the district court denied as moot in January 2015, stating that it had already granted Giles's motion to recruit and that Giles would be notified if an attorney volunteered to take the case.

Giles also moved multiple times, beginning on October 16, 2014, to appoint an expert. The magistrate judge denied these motions, stating "[t]he discovery period is closed, but the plaintiff may later seek to appoint an expert for trial if the [defendants'] motion for summary judgment is denied."

Giles now appeals the district court's grant of summary judgment on his claim for deliberate indifference to serious medical needs and his conditions-of-confinement claim, as well as the district court's actions regarding his motions to recruit counsel and appoint an expert.

## II. Discussion

We review the district court's grant of summary judgment *de novo*. *Knopick v. Jayco, Inc.*, 895 F.3d 525, 528 (7th Cir. 2018). A district court properly grants summary judgment where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir.

2018). All justifiable inferences are drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The non-movant must, however, present specific facts establishing a material issue for trial, and any inferences must rely on more than mere speculation or conjecture. *Aguilar v. Gaston-Camara*, 861 F.3d 626, 630–31 (7th Cir. 2017).

The Eighth Amendment, applicable to the States through the Fourteenth Amendment, prohibits the infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII; *Estelle v. Gamble*, 429 U.S. 97, 101 (1976). The Supreme Court has interpreted the Eighth Amendment to prohibit any punishments "which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain.'" *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). Thus, the Eighth Amendment gives rise to constitutional claims by inmates alleging that the conditions of their confinement violate this prohibition by imposing "the wanton and unnecessary infliction of pain." *See Rhodes*, 452 U.S. at 347. The Supreme Court has further established that prison officials impose wanton and unnecessary infliction of pain when they are deliberately indifferent to an inmate's serious medical needs. *Estelle*, 429 U.S. at 104. Giles here appeals summary judgment on both a claim of deliberate indifference to his serious medical needs as well as a conditions-of-confinement claim. We discuss each in turn.

### A. Deliberate Indifference to Serious Medical Needs

To establish an Eighth Amendment claim for deliberate indifference to serious medical needs, the plaintiff must show two elements: one objective and one subjective. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). "[T]he plaintiff must prove that he suffered from '(1) an

objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Id.* (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). "[D]eliberate means more than negligent," though "something less than purposeful." *Duckworth*, 532 F.3d at 679. We have described this subjective element as "'a sufficiently culpable state of mind,' something akin to recklessness." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (quoting *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013)). Although the inmate must demonstrate deliberate indifference, he "is not required to show that he was literally ignored." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)).

Regarding the objective element of his claim, Giles has clearly met his burden. His schizoaffective disorder diagnosis, his symptoms, and his multiple prescriptions for psychotropic medications firmly establish that he suffered from an objectively serious medical condition. *See id.* ("A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention."). Giles's claim hinges, therefore, on whether he has shown the defendants possessed the "sufficiently culpable state of mind" necessary to establish the subjective element of deliberate indifference. The district court held that Giles failed to meet this burden. We agree.

Giles cannot establish the subjective element of his claim because the defendants are all non-medical officials who reasonably relied on the judgment of medical professionals. We have long recognized that the division of labor within a prison

necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment. "If a prisoner is under the care of medical experts … a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Id.* at 656 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). As the Third Circuit has held, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official … will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Spruill*, 372 F.3d at 236.

In *Hayes v. Snyder*, 546 F.3d 516, 527–28 (7th Cir. 2008), we affirmed summary judgment for non-medical prison officials who relied on the professional judgment of prison medical staff. Like Giles, the inmate in *Hayes* sent several letters and filed multiple grievances alleging he was receiving inadequate treatment for his objectively serious medical condition. *Id.* at 526. Although the non-medical officials did not ignore the inmate's grievances entirely, they did not investigate further than the medical staff's reports and summaries, and otherwise simply referred the complaints to the medical staff. *Id.* at 527. We held that the non-medical officials did not have "any duty to do more than they did, in light of their knowledge of the situation." *Id.* They "were entitled to rely on the professional judgment of medical prison officials" and "nothing in [the medical] reports made it obvious that [the inmate] might not be receiving adequate care." *Id.* at 527–28.

A review of the record demonstrates that throughout his various stints at Illinois River, Stateville, Pontiac, and Lawrence, Giles was receiving regular medical attention from

psychologists, psychiatrists, and mental health professionals. Although the record does not contain detailed information about what the grievance procedures were at each facility, it does contain evidence that several of his grievances were subjected to emergency review. Furthermore, Giles's appeals were reviewed by the ARB, which found his complaints to be without merit upon investigation. Giles has not presented evidence that his grievances were ignored or mishandled. Nor was there an indication from his medical records that he was not receiving adequate care. In short, the non-medical officials relied on the medical professionals to provide proper treatment, and there was nothing to give notice to the officials of a need to intervene.

Giles asserts the defendants were deliberately indifferent by allowing him to "go on and off of his medication many times" despite knowing his health condition required continuous treatment. However, the record does not support this assertion. Giles's medications were discontinued in July 2010 while still at Dixon pursuant to a decision made by medical professionals. Several weeks later, after being transferred first to Illinois River and then to Stateville, Giles was placed back on medications soon after he requested them. Although there were other brief delays in his receipt of medication, when he brought these to the medical professionals' attention his concerns were addressed, or else it was determined after a review of all available information that he was properly receiving his medication as prescribed. Even during one of the periods where Giles alleged he was not receiving his medication, a psychiatrist reported after an extended interview that Giles's demeanor was good, he was coherent and alert, and he displayed no acute distress or agitation. Such reports from the medical professionals charged with Giles's care defy the

conclusion that the non-medical defendants knew of and disregarded an excessive risk to Giles's health and safety.

The most serious lapse in treatment was the two-week period in November 2010 when he was transferred back to Illinois River from Stateville. This lapse was caused by a failure to include his current prescriptions on his transfer summary. While this was certainly a concerning oversight, it does not meet the standard of deliberate indifference: a knowing disregard of an excessive risk to Giles's health and safety. As we have noted before, "deliberate means more than negligent." *Duckworth*, 532 F.3d at 679. Giles's medication was re-prescribed as soon as he was examined by a psychologist at Illinois River, who requested and reviewed Giles's medical records from Stateville.

No reasonable jury could find that the defendants knew of and disregarded an excessive risk to Giles's health and safety, and thus summary judgment on this claim was appropriate.

### B. Conditions of Confinement

Giles also appeals the grant of summary judgment on his conditions-of-confinement claim. Although the complaint focused on specific conditions to which Giles was subjected while in segregation (such as vermin infestations, filthiness, and lengthy periods of isolation), on appeal Giles has reframed the violation as being the combined effect that these conditions had on his mental health.[4] He asserts his placement in segregation subjected him to conditions which exacerbated his symptoms, or which were more difficult for him

---

[4] Giles's counsel explained at oral argument "what's happening to his mental health while he's in segregation is the conditions of confinement violation."

to cope with due to his symptoms. He argues that even though segregation placement and the conditions of his confinement may not have been cruel and unusual in the case of an ordinary inmate, they amounted to cruel and unusual treatment in his case given their combined effect on his illness.

The Eighth Amendment prohibits the States from subjecting prisoners to conditions of confinement amounting to cruel and unusual punishment. *Rhodes*, 452 U.S. at 345–47. According to the Supreme Court, however, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Whether conditions of confinement are cruel and unusual must be judged in accordance with contemporary standards of decency. *Id.* at 8; *Rhodes*, 452 U.S. at 346. If under contemporary standards the conditions cannot be said to be cruel and unusual, then they are not unconstitutional, and "[t]o the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes*, 452 U.S. at 347.

As with a claim for deliberate indifference to serious medical needs, a conditions-of-confinement claim includes an objective and a subjective component. *Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017). The plaintiff must first establish "an objective showing that the conditions are sufficiently serious—*i.e.*, that they deny the inmate 'the minimal civilized measure of life's necessities,' creating an excessive risk to the inmate's health and safety." *Id.* (quoting *Rhodes*, 452 U.S. at 347) (internal citations omitted). The plaintiff must next establish "a subjective showing of a defendant's culpable state of mind." *Id.* Once again, the state of mind necessary to establish liability is deliberate indifference to the inmate's health or

safety. *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000).

Giles attempts to satisfy the objective element by arguing that placing a mentally ill inmate in segregation—under conditions that exacerbate his symptoms or with which he has difficulty coping due to his symptoms—is an objectively serious condition creating an excessive risk to his health and safety. We have indeed recognized that prolonged segregated confinement may constitute an Eighth Amendment violation in some instances. *See Isby*, 856 F.3d at 521 (quoting *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 666 (7th Cir. 2012)). We have also held that the aggregate effect of a multitude of individual conditions may constitute a violation even if each individual condition could not establish a violation standing on its own. *Id.* at 522. However, this only occurs when the conditions "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)). The core issue is whether the conditions deprived the plaintiff of a "minimal civilized measure of life's necessities." *Rice*, 675 F.3d at 664–65.

While we do not deny that Giles experienced harsh conditions in segregation, the record does not support a finding that he was deprived of the minimal civilized measure of life's necessities, even considering the effects on his mental condition. He was regularly evaluated by mental health professionals at all facilities, and they repeatedly determined that his condition did not contraindicate continued segregation. And on the occasion in November 2011 when a mental health professional determined that his mental condition was being exacerbated by his cell assignment, he was reassigned and

moved the next day, checked on less than a week later, and was found to have notably improved. Giles has therefore not established the objective element of his claim.

Even if Giles could establish an objectively serious condition, he ultimately fails to establish the necessary subjective component of his claim: the defendants' culpable state of mind. Once again, the defendants relied on the judgment of the medical professionals into whose care Giles was entrusted. No reasonable jury could find that the defendants consciously disregarded an excessive risk to Giles's health by keeping him in segregation when the mental health professionals continually reported it was appropriate to do so.

Since Giles failed to establish both the objective and subjective elements of his claim, summary judgment in favor of the defendants was proper.

### C. Motions to Recruit Counsel and Appoint Expert

The final issue on appeal concerns the district court's handling of Giles's motions to appoint or recruit counsel and to appoint an expert. We review the district court's decisions on these motions for abuse of discretion. *Pruitt v. Mote*, 503 F.3d 647, 649, 658 (7th Cir. 2007) (en banc) (reviewing a decision on a motion to recruit counsel for abuse of discretion); *Ledford v. Sullivan*, 105 F.3d 354, 358 (7th Cir. 1997) (holding that a decision on a motion for appointment of an expert witness is reviewed for abuse of discretion). In reviewing for abuse of discretion, we do not substitute our own judgment for the district court's; rather, the "decision must strike us as fundamentally wrong for an abuse of discretion to occur." *Ladien v. Astrachan*, 128 F.3d 1051, 1056 (7th Cir. 1997).

We note at the outset of our discussion that "[t]here is no right to court-appointed counsel in federal civil litigation." *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014). However, the district court does have the discretion to recruit a volunteer to represent a plaintiff who cannot otherwise afford counsel. *Navejar*, 718 F.3d at 696. The court "must rely on the generosity of lawyers to volunteer their time and skill on behalf of indigent civil parties." *Wilborn v. Ealey*, 881 F.3d 998, 1008 (7th Cir. 2018).

Evaluating whether to recruit counsel involves a two-step process. First, the court must determine if the plaintiff made a reasonable attempt to secure counsel on his own. *Navejar*, 718 F.3d at 696. Next, the court must examine "whether the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it." *Id.* (quoting *Pruitt*, 503 F.3d at 655). Even where the court decides to recruit a volunteer, however, it does not have "an indefinite commitment to search until a volunteer is found." *Wilborn*, 881 F.3d at 1008.

The insufficient number of volunteer attorneys in some of our districts limits courts' ability to locate representation for indigents. *See James v. Eli*, 889 F.3d 320, 330–31 (7th Cir. 2018). This case presents the question of what a court should do in the event a court determines that the case's complexity appears to exceed the plaintiff's capacity to litigate his claims and the court exercises discretion to seek a volunteer attorney but is unable to find one.

We considered a similar question in *Wilborn v. Ealey*, 881 F.3d 998 (7th Cir. 2018). In that case, the plaintiff filed multiple motions to recruit counsel. The district court eventually granted one such motion and spent several months searching.

After contacting over four hundred attorneys, the court identi-
fied a volunteer. This success was short-lived, though. The
attorney had a scheduling conflict, which ultimately led the
court to grant his motion to withdraw. Despite this change,
the plaintiff did not file another motion to recruit counsel. The
court offered to postpone the trial, but the plaintiff declined
the court's offer. As a result, the court allowed the plaintiff to
proceed to trial pro se. Based on those facts, we decided that
the court's efforts were "more than enough to satisfy any duty
to the indigent plaintiff," and we held that the court did not
abuse its discretion in allowing the plaintiff to try his case pro
se. *Id.* at 1008.

Here too, we conclude that the district court fulfilled its
obligation to Giles by circulating a request for representation
to the court's list of approximately fifty attorneys on three sep-
arate occasions over the course of one year. Yet it is somewhat
concerning that at some point the court determined further
searching would be futile and, without communicating that
update to Giles, decided it was appropriate to resolve the
pending motion for summary judgment.

Acknowledging that "[t]here are limits to what a court
must do after deciding to recruit counsel," *id.*, in cases such as
this—where the complexities of litigating are high, having
counsel is increasingly important, and a district court has con-
cluded that it is unable to locate a volunteer attorney—it
would be advisable for a judge to communicate with the
plaintiff and consider offering a reasonable continuance be-
fore proceeding to rule on a dispositive motion. The addi-
tional time after a court has exhausted its search efforts might
afford a limited opportunity for indigent litigants to seek

counsel on their own, or at a minimum, conduct some preliminary discovery.

The district court also denied Giles's motion to appoint an expert witness, holding that an expert was not necessary before summary judgment but stating that Giles could move to appoint an expert for trial if his case survived summary judgment. A court may, in its discretion, appoint an expert witness where the expert's "specialized knowledge will assist the trier-of-fact to understand the evidence or decide a fact in issue." *Ledford*, 105 F.3d at 358–59. The district court determined Giles's claims failed as a matter of law to show the defendants knowingly disregarded a substantial risk of serious harm to him. This decision did not hinge on specialized knowledge or fact-finding. Instead, the court recognized Giles had received consistent treatment from medical professionals and the defendants had relied on the medical judgment of those professionals. The grant of summary judgment was based on Giles's failure to establish the defendants' sufficiently culpable state of mind, not on a technical analysis of the medical treatment he received or the sufficiency of that treatment. Thus, the district court acted fully within its discretion by denying the motion to appoint an expert witness at that stage of litigation.

### III. Conclusion

Prison is, by its very nature, an unpleasant place to be, and we have no doubt that Giles's objectively serious condition and symptoms contributed to his overall discomfort. The dispositive defect of Giles's case, however, is that the defendants against whom he has filed this action are non-medical officials who were entitled by law to rely on the judgment of the medical professionals under whose care Giles was placed. Section 1983 does not create a system of vicarious liability. The

defendants cannot be held liable unless they were aware of facts from which a reasonable inference could be drawn that Giles was subjected to a substantial risk of serious harm, drew such an inference, and yet did not intervene. Based on this record, we hold that Giles has failed to make that showing, and therefore has failed as a matter of law to establish deliberate indifference. We AFFIRM the judgment of the district court.