In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 19-1562

JAMES A. LEWIS,

*Plaintiff-Appellant,*

*v.*

ANGELA MCLEAN and
JOSEPH CICHANOWICZ,

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:14-cv-00280-jdp — **James D. Peterson**, *Chief Judge*.

———————————

SUBMITTED OCTOBER 18, 2019 — DECIDED OCTOBER 29, 2019

———————————

Before FLAUM, RIPPLE, and SYKES, *Circuit Judges*.

PER CURIAM. We previously vacated the entry of summary judgment for certain defendants in this case brought by James Lewis, a Wisconsin prisoner, for alleged violations of his Eighth Amendment rights. We concluded that a reasonable jury could find that a nurse and a correctional officer acted with deliberate indifference by delaying medical attention for Mr. Lewis's painful back condition. *Lewis v. McLean*,

864 F.3d 556, 563–65 (7th Cir. 2017). We also suggested that, on remand, the district court should consider whether to re-instate Mr. Lewis's state-law medical malpractice claim against the nurse. *Id.* at 566. On remand, Mr. Lewis went to trial and was represented by recruited counsel. The jury found for the defendants. Mr. Lewis immediately moved, pro se, to set aside the verdict and for a new trial. The dis-trict court, construing Mr. Lewis's motion under Federal Rule of Civil Procedure 59(a), denied his motion. Because we conclude that there is a rational basis for the jury's decision, and that the district court committed no error warranting further proceedings, we affirm the judgment of the district court.

## I.

## BACKGROUND

When the district court first recruited counsel for Mr. Lewis on remand, its order explained that "the scope of representation extends to proceedings in this court only."[1] The order directed Mr. Lewis to work with counsel and not communicate directly with the court "from this point for-ward."[2] Soon after, the district court directed Mr. Lewis to "state whether he intend[ed] to proceed with the medical malpractice claim"[3] but received no response. Several months later, Mr. Lewis filed a pro se motion to "reinstate" his medical malpractice claim and to impose sanctions on

---

[1] R.113 at 1.

[2] *Id.*

[3] R.117.

the defendants for spoliation of evidence.[4] The district court reminded Mr. Lewis to communicate through his attorney. Counsel later informed the court that Mr. Lewis was withdrawing his motion to reinstate the medical malpractice claim.[5]

At trial, Mr. Lewis testified that a little after 5:00 a.m. on February 8, 2014, after waking and trying to stand, he experienced debilitating pain from the base of his neck down his back. "[T]here[ was] nothing wrong" with his arms or legs, but the pain confined him to a sitting position on his bed.[6] Through the pain, he leaned forward about four feet and "barely hit" the call button to the left of his cell door to indicate a medical emergency.[7] Around 5:40 a.m., a correctional officer came to Mr. Lewis's cell. Mr. Lewis asked to see a nurse. Fifteen minutes later, after no one else appeared, Mr. Lewis hit the button again.

Sometime between 6:00 and 6:15 a.m., Angela McLean, a nurse, and Lieutenant Joseph Cichanowicz,[8] a security supervisor, came to Mr. Lewis's cell. When Nurse McLean told Mr. Lewis that she could evaluate him only in the prison's Health Services Unit, Mr. Lewis said that he was unable to stand up. Lieutenant Cichanowicz told Mr. Lewis to put his

---

[4] R.121.

[5] R.135.

[6] R.193 at 16:21–24; 10:6–12.

[7] *Id.* at 10:14–24; 11:13–14.

[8] Mr. Cichanowicz has since been promoted to Captain. R.193 at 117:15–18.

hands through the trap in the cell door for shackling. Lieu-
tenant Cichanowicz told Mr. Lewis that, because he had
reached the call button next to the cell door, he could man-
age to reach his hands out the trap in the door. Mr. Lewis
testified that the cell door was recessed, so he would have
had to reach an extra six to eight inches beyond the call but-
ton—a feat he deemed impossible because of the pain. Lieu-
tenant Cichanowicz suggested that Mr. Lewis could crawl to
the door. After some back-and-forth, Mr. Lewis yelled,
"What part of 'I can't stand' don't you all understand?"[9]
Nurse McLean and Lieutenant Cichanowicz then left.

After another twenty to thirty minutes, Mr. Lewis at-
tempted to ease himself to the floor. When his knees hit the
floor, he fell to his side, screaming in pain. Around 7:30 a.m.,
a correctional officer monitoring the security video notified
Nurse McLean that Mr. Lewis was on the floor, and Nurse
McLean called a physician. The physician then ordered that
Mr. Lewis be transported to a hospital emergency room. A
few correctional officers, along with medical first respond-
ers, arrived around 7:50 a.m. Mr. Lewis, a former nurse, de-
manded that the officers use a neck brace and stretcher, but
instead they shackled Mr. Lewis and put him in a wheel-
chair. Mr. Lewis was driven to the hospital, arriving at
8:53 a.m. There, a physician diagnosed muscle spasms and
prescribed morphine for his pain. About an hour later,
Mr. Lewis left the hospital able to stand and walk on his
own.

Lieutenant Cichanowicz testified that when he respond-
ed to Mr. Lewis's call, he did not consider Mr. Lewis's situa-

---

[9] *Id.* at 17:4–5.

tion a medical emergency—which would involve symptoms like "excessive blood loss," "unconscious[ness]," or "shallow breathing."[10] Mr. Lewis, however, was "sitting on his bed … with his hands up on his lap" and was "coherent."[11] Lieutenant Cichanowicz recalled Mr. Lewis insisting that he could not reach the door and that he was "agitated" and "visibly upset."[12] Lieutenant Cichanowicz testified, however, that sometimes an inmate initially unwilling to be restrained later changes his mind. Further, he testified, there was a risk that Mr. Lewis had created a "setup" to lure officers into his cell.[13] Lieutenant Cichanowicz doubted Mr. Lewis because, as he opined, the reach from Mr. Lewis's bed to the trap door would have been "about the reach for the button."[14]

Nurse McLean, too, testified that she did not view Mr. Lewis's situation as a "serious medical emergency" because Mr. Lewis was talking and breathing, had an airway, was sitting, and was not paralyzed (he could move his extremities).[15] Her progress note, written at 6:40 a.m., stated that Lieutenant Cichanowicz told her that the video feed of Mr. Lewis's cell showed that Mr. Lewis had sat up at 5:15 a.m. and "then [did] not move again" until he leaned

---

[10] *Id.* at 131:6–11.

[11] *Id.* at 138:6–19.

[12] *Id.* at 138:14–15; 146:22.

[13] *Id.* at 138:19.

[14] *Id.* at 148:23–24.

[15] R.190 at 16:2–19.

forward to push the button minutes later.[16] Nurse McLean did not find that remarkable for someone with back pain. She and Lieutenant Cichanowicz decided to monitor Mr. Lewis before acting further. She called a physician once she learned from another correctional officer that Mr. Lewis was on the floor, crying in pain.

Before trial, Mr. Lewis's attorney moved for an adverse-inference jury instruction based on spoliation of evidence. The defendants did not produce video of Mr. Lewis's cell between 5:15 a.m., when Mr. Lewis first sat up in bed, and 7:12 a.m.[17] The only video of Mr. Lewis on this day begins at 7:12 a.m. and was preserved because of the cell extraction that occurred later that morning. The defendants explained that the video feed records only when there is movement in a cell. Even if the video had recorded between 5:15 a.m. and 7:12 a.m., the recording would have been automatically overwritten when the digital video recorders reached their storage capacities unless someone specifically downloaded the recording and saved it on a separate database. In contrast, the prison preserved the existing video that began at 7:12 a.m. because of that morning's cell extraction. Further, neither Nurse McLean nor Lieutenant Cichanowicz had anything to do with the video-retention policy. The district court denied a spoliation instruction but prohibited the defendants from arguing that Mr. Lewis was able to move during this time period.

---

[16] *Id.* at 16:2–6.

[17] We do not know the significance of the 7:12 a.m. start time.

The jury returned a verdict in the defendants' favor. Mr. Lewis brought a pro se motion to set aside the jury verdict and for a new trial, arguing that he received ineffective assistance of counsel and that the court had erroneously refused to allow him to represent himself and personally cross-examine Nurse McLean. In a supplement, Mr. Lewis also argued that the district court should have granted his pro se motion to reinstate the malpractice claim because recruited counsel represented him "on his federal claim, only."[18] The district court denied his motion because a civil litigant has no constitutional right to counsel, *Pruitt v. Mote*, 503 F.3d 647, 656 (7th Cir. 2007), and because the transcript did not reflect (nor could the court recall) that Mr. Lewis had ever expressed a desire to conduct Nurse McLean's cross-examination himself. Further, the court rejected the idea that Mr. Lewis had represented himself on the state-law claim, explaining that the court had "recruited counsel to represent Lewis in all of his claims before this court arising out of the events at issue in this case—federal and state alike.[19] The court also considered whether the verdict was against the weight of the evidence but, after viewing the evidence in the light most favorable to the verdict, concluded that it was well-supported.

## II.

## DISCUSSION

We review a decision to deny a Rule 59(a) motion for abuse of discretion. *Moore ex rel. Estate of Grady v. Tuelja*, 546

---

[18] R.164 at 1.

[19] R.172 at 3.

F.3d 423, 427 (7th Cir. 2008). A new trial is appropriate if the jury's verdict is "against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Martinez v. City of Chicago*, 900 F.3d 838, 844 (7th Cir. 2018) (quoting *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014)) (internal quotation marks omitted).

Mr. Lewis submits that the trial was unfair to him. He first contends that the district court improperly denied him the opportunity to present pro se motions to reinstate his state-law claim for medical malpractice. Specifically, Mr. Lewis argues that the "four corners" of the district court's order recruiting counsel limited the scope of representation to only the "proceedings in this court only," which did not at that time include a malpractice claim.[20] This is a strained reading of that order; as the district court explained, the "'[p]roceedings in this court' include all matters leading up to a final judgment on the merits."[21] Any motion to reinstate a state-law claim over which the district court previously had exercised jurisdiction is obviously included in such proceeding. *See Lewis*, 864 F.3d at 565–66. Because his medical malpractice claim was also against the physician who allegedly failed to give instructions to take him to a hospital using a stretcher and neck brace, Mr. Lewis adds that the denial of his motion to reinstate the claim deprived him of the chance to have the physician testify at trial. The district court, however, could not have revived a claim against the physician: we ruled in the first appeal that summary judgment was properly entered in her favor on all claims. *Id.* at

---

[20] Appellant's Br. 12–13.

[21] R.113 at 1 n.1.

563. Furthermore, Mr. Lewis could have subpoenaed the doctor's testimony regardless whether she was a defendant.

Mr. Lewis next contends that the district court wrongly prevented him from representing himself at trial. He admits that he did not ask the court to allow him to represent himself, but he now protests that an earlier order convinced him he could not. He cites the order advising him, when newly represented, "that he must refrain from filing directly with the court now that he has counsel."[22] Mr. Lewis views this advice as inconsistent with the district court's later statement that if Mr. Lewis had wanted to represent himself at trial, "he should have brought that issue to [this court's] attention at that time, not in a post-trial motion."[23] There is nothing confusing or contradictory about the two orders. One advised him that only counsel should file papers with the court while Mr. Lewis was represented. The second made the sensible observation that the court could not have granted a request that was never made. Nothing stopped Mr. Lewis from asking recruited counsel to withdraw. *Cty., Mun. Emps.' Supervisors' & Foremen's Union Local 1001 v. Laborers' Int'l Union*, 365 F.3d 576, 579 (7th Cir. 2004) ("[A]n attorney must withdraw from the representation as soon as the client so instructs."). Mr. Lewis's misunderstanding of these two orders is not grounds for a new trial.

Mr. Lewis also contends that the defendants unfairly prejudiced his case by failing to produce a video recording of his cell between 5:15 a.m. and 7:12 a.m. Mr. Lewis argues

---

[22] Appellant's Br. 16–18; R.122.

[23] R.165 at 3.

that he was denied the chance to corroborate his testimony about being immobilized by pain during this time period. We also expressed concern about the whereabouts of the missing video; in our previous decision, we advised the district court to consider reopening discovery so that Mr. Lewis could "explore more fully whether additional recordings exist and, if not, why more video was not preserved." *Lewis*, 864 F.3d at 565. On remand, with the assistance of counsel, Mr. Lewis did just that. But the district court ultimately concluded that neither defendant was responsible for not retaining the video.

Although Mr. Lewis does seem to argue on appeal that the defendants destroyed the video in bad faith, he does not argue that these defendants had a duty to preserve the video recording. For an adverse-inference instruction to be given, he needed to establish *both* a duty to preserve and destruction in bad faith. *See Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2013). We "review a district court's denial of an adverse inference instruction for abuse of discretion." *Id.* (citing *Park v. City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002)). Thus, where Mr. Lewis did not establish (or even allege) that the defendants had a duty to preserve the video, the district court was within its discretion in declining to give an adverse-inference instruction for spoliation of evidence.

Despite not making a finding of spoliation, the district court prohibited the defendants from arguing that Mr. Lewis could move during that time. Mr. Lewis insists that the defendants violated that admonition by introducing testimony that he could move his hands and that he did not cry and beg. It was never in question, however, that Mr. Lewis could move his hands—Mr. Lewis testified that he reached for-

ward twice to touch the call button and that there was "nothing wrong" with his arms or legs.[24] Nor was it in dispute that Mr. Lewis cried and begged for help—both while he was in bed and while on the floor—during this time period. No one testified otherwise: Lieutenant Cichanowicz testified that Mr. Lewis became "emotional" and "visibly upset" while they talked;[25] Nurse McLean agreed that Mr. Lewis had asked for help and been adamant about feeling such pain that he could not stand.

Mr. Lewis also argues that the verdict was against the manifest weight of the evidence. When asked to overturn a jury verdict, our "narrow" role is to determine if a "reasonable basis exists in the record to support the verdict." *Grady*, 546 F.3d at 429 (quoting *Trzcinski v. Am. Cas. Co.*, 953 F.2d 307, 315 (7th Cir. 1992)) (internal quotation marks omitted). A verdict is set aside only if no rational jury could have rendered it. *Id.* at 427.

We note that the district court applied an incorrect standard when ruling on the Rule 59 motion by viewing the evidence in the light most favorable to the prevailing parties. The district court relied on *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004), where we viewed the evidence in the light most favorable to the prevailing parties upon *appellate review* of the record. The district court was required, however, to perform "its own assessment of the evidence presented." *Mejia v. Cook Cty.*, 650 F.3d 631, 634 (7th Cir. 2011). In *Mejia*, we reversed the district court for viewing the evidence

---

[24] R.193 at 16:21–24.

[25] *Id.* at 146:20–22.

in the light most favorable to the prevailing party, rather than "neutrally." *Id.*; *see* 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2806 (3d ed. 2019).

The use of the wrong standard "normally make[s] a remand appropriate." *Mejia*, 650 F.3d at 634. In *Mejia*, the district court denied the motion for a new trial because it reasoned that "it could not set aside the verdict on weight-of-the-evidence grounds 'unless the testimony is such that reasonable persons could not believe it, because it contradicts indisputable physical facts or laws.'" *Id.* at 633. We held that the "indisputable facts" language applies only when the district court seeks to remove evidence from the weighing process. *Id.* at 634. It does not apply when the court merely weighs evidence. *Id.* Reasoning that usage of the "indisputable facts" language "elevate[s] the standard for a motion for a new trial," and noting that the district court's discussion of the facts "[made] clear that the district court wrongly believed that its power to weigh the evidence was limited by the 'indisputable facts' language," we remanded the case for reconsideration under the proper standard. *Id.* We emphasized that "the district court is in the best position to evaluate the evidence and determine whether the verdict was against the manifest weight"—so it must perform its own assessment of the evidence presented. *Id.* at 635.

In this case, by contrast, the district court's error was harmless. We are confident that a rational jury could have arrived at the verdict even when the evidence is viewed neutrally. Indeed, the district court explicitly stated that "[t]he jury could reasonably find that neither Cichanowicz and McClean [sic] had consciously failed to take reasonable

measures to provide treatment for Lewis's serious medical need."[26] It concluded that the jury's verdict was "well-supported by the evidence."[27] Therefore, although the district court *stated* the wrong standard, it *applied* the correct one.

We agree that this verdict is well-supported. Prison officials are liable under the Eighth Amendment if they know of and disregard a substantial risk of serious harm to an inmate's health. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Delaying treatment can constitute deliberate indifference in some circumstances. *Perez v. Fenoglio*, 792 F.3d 768, 777–78 (7th Cir. 2015). In this case, however, a jury reasonably could find that Lieutenant Cichanowicz and Nurse McLean were justified in not immediately sending Mr. Lewis to the hospital when he would not agree to be transported to the health unit. Nurse McLean could not treat Mr. Lewis in his cell, and Lieutenant Cichanowicz testified that officers must be wary of attempts to lure them into prisoners' cells. *See Scarver v. Litscher*, 434 F.3d 972, 977 (7th Cir. 2006) (discussing relationship between security concerns and treatment of prisoners). Nurse McLean did not think emergency care was necessary when Mr. Lewis could move his limbs, breathe, and talk; in other words, she exercised her professional judgment. "[A] treatment decision that's based on professional judgment cannot evince deliberate indifference." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016). Lieutenant Cichanowicz was entitled to rely on that judgment. *See Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019). A rational jury could find that, even if

---

[26] R.165 at 3.

[27] *Id.*

wrong, the decision to monitor Mr. Lewis and wait to call a physician until his condition grew worse did not rise to the level of deliberate indifference.

For these reasons, we affirm the judgment of the district court.

AFFIRMED